## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE ASSAD, directly on behalf of himself and all others similarly situated, and derivatively on behalf of E.MERGE TECHNOLOGY ACQUISITION CORP., <br><br> Plaintiff, <br><br> v. <br><br> E.MERGE TECHNOLOGY ACQUISITION CORP., <br><br> Nominal Defendant, <br><br> v. <br><br> E.MERGE TECHNOLOGY SPONSOR LLC, S. STEVEN SINGH, JEFF CLARKE, GUY GECHT, SHUO ZHANG, DAVID IBNALE, CURTIS FEENY, ALEX VIEUX AND STEVEN FLETCHER, <br><br> Defendants. | **CASE NO. _____** <br> **JURY TRIAL DEMANDED** |

### VERIFIED DIRECT AND DERIVATIVE COMPLAINT FOR BREACH OF THE INVESTMENT COMPANY ACT OF 1940 AND THE INVESTMENT ADVISERS ACT OF 1940

George Assad ("Plaintiff") brings this action as a holder of common stock of Nominal Defendant E.Merge Technology Acquisition Corp. ("E.Merge" or the "Company"), a Delaware corporation, on behalf of the Company and on behalf of himself and all others similarly situated, against E.Merge Technology Sponsor LLC ("Sponsor" or "Sponsor Defendant"), S. Steven Singh, Jeff Clarke, Guy Gecht, Shuo Zhang, David ibnAle, Curtis Feeny, Alex Vieux, and Steven Fletcher (the "Individual Defendants").

Plaintiff seeks a declaratory judgment, damages, and rescission of contracts whose formation and performance violate the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 *et*

*seq.* ("ICA") and the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1 *et seq.* ("IAA"). In support thereof, Plaintiff alleges as follows:

## I. NATURE AND SUMMARY OF THE ACTION

1.      E.Merge is a special purpose acquisition company, or "SPAC," which raised $600 million in its IPO.

2.      This case arises because E.Merge qualifies as an investment company under the ICA and Defendants Vieux and Fletcher (the "Advisor Defendants") qualify as investment advisers under the IAA. Neither E.Merge nor the Advisor Defendants have satisfied their obligations to register under these statutes, however, and numerous aspects of E.Merge's capital structure, operations, and compensation scheme violate the ICA and IAA.

3.      The ICA and IAA are key federal laws that regulate the rights of an investment company's shareholders and the form and amount of its managers' compensation.  By telling the world that E.Merge is not an "Investment Company" as that term is defined in the ICA, Defendants have structured the Company so as to charge its public investors what amounts to more than one hundred million dollars in compensation.  Under the ICA and IAA, the form and amount of this compensation are illegal.

4.      Under the ICA, an investment company is an entity whose primary business is investing in securities. From the time of its formation, this is all E.Merge has ever done with its assets.

5.      In 1940, Congress passed the ICA to protect investors from Depression-era "abuses [that] stemmed from the control of investment companies by banking, brokerage, or dealer

interests."[1]   Because investment companies had no employees or resources of their own, they were especially vulnerable to exploitation by outside financial advisers, who sometimes called themselves "sponsors" and who controlled the investment companies that they established and managed. Congress expressed concern that "control [of investment companies would be] exercised to benefit the sponsor[s]" or advisers of investment companies, exposing the companies' investors to risks of confusion and abuse. [2]

6.      In response, Congress passed the ICA and its sister statute, the IAA. Together, these statutes impose a comprehensive regulatory regime to address abuses that arise when outsiders dominate an investment company. These laws regulate the capital structure of an investment company, as well as the rights and powers of investors, and the kind and amount of compensation that sponsors, investment advisers, directors, and officers can be paid. These laws ensure the fairness and transparency of the governance of investment companies and the relationships between investment companies and their advisers. The law also grants shareholders private rights of action to seek damages and to rescind agreements that violate these statutes.

7.      In addition to popular investment vehicles such as mutual funds and exchange-traded funds, or "ETFs," the ICA also covers a broad scope of other types of companies in order to accomplish its goal of protecting investors. The ICA applies to any company that satisfies the statute's definition of an "investment company," which includes any entity that is "engaged primarily" "in the business of investing, reinvesting, or trading in securities." The IAA likewise applies to any person that satisfies the definition of an "investment adviser," which the statute

---

[1] Note, *The Investment Company Act of 1940*, 50 YALE L.J. 440, 441-442 (1940) (citing *Hearings Before Subcomm. of Sen. Comm. on Banking and Currency*, S.3580, 76th Cong., 3d Sess. (1940)).

[2] *Id.*, at 442.

defines to mean "any person who, for compensation, engages in the business of advising others" "as to the advisability of investing in, purchasing, or selling securities."

8.     Accordingly, the ICA and IAA have been held by courts to apply to a wide range of entities, including so-called "acquisition companies" that sell off their former operating assets and primarily hold securities while searching for new operating businesses to acquire. The SEC has applied the ICA to companies, like E.Merge, that raise money and invest it in government securities as they search for acquisitions in real estate or other assets.

9.     E.Merge is an investment company under the ICA because its primary business is to invest in securities. Indeed, investing in securities is all the Company has ever done. From the moment of its IPO, the Company has invested effectively all of its assets in securities of the United States government and shares of money market mutual funds.

10.     Likewise, the Advisor Defendants are the Company's investment advisers under the IAA. The Company relies entirely on the Advisor and Director Defendants for the expertise and administrative resources required to make its investments in securities.

11.     The way the Defendants have structured the Company poses the precise danger the ICA sought to address. Like the investment companies that concerned Congress in 1940, E.Merge is dominated by an outside Sponsor. The Company has no full-time employees of its own. Instead, all of its directors, officers, and advisors are members and owners of the Sponsor. None of these directors, officers, and advisors receive compensation directly from the Company. They take their compensation instead indirectly via their ownership interests in the Sponsor and their participation in payments made by the Company to the Sponsor.

12.     Rather than pay reasonable fees and structure them in the standardized and transparent ways required by the law, the Company has paid Defendants in a special class of shares,

unavailable to the general public, that gives Defendants an economic interest equal to at least 20% of the Company's outstanding equity—and potentially much more. Defendants received all this for a purchase price of just $25,000. The potential value of this compensation could exceed $100 million. This is hardly the arm's-length bargain between an investment company and an outside manager that the ICA demands.

13.     The Defendants suggest that they can avoid the ICA and IAA because, they say, E.Merge is not an investment company but a SPAC. They say that the Company's primary purpose is not to invest in securities but instead to acquire an operating business. However, investing in securities is all the Company has ever done since its IPO.

14.     Wherever the line between an investment company and an operating company is located, there can be no doubt that E.Merge is on the investment-company side of it.

15.     Accordingly, Plaintiff respectfully requests that this Court enter a declaratory judgment stating that the Company is an investment company under the ICA and the Advisor Defendants are its investment advisors under the IAA.

16.     Plaintiff also requests that this Court enter an order rescinding certain elements of the Defendants' compensation for having breached the ICA and IAA.

17.     Plaintiff further requests that this Court enter an order for damages reflecting the Defendants' breach of their fiduciary obligations under the ICA and such other relief as this Court may deem just and proper.

## II. JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to ICA Sections 36(b), 44, and 47(b). 15 U.S.C. §§ 80a-35(b), 80a-43, 80a-46(b), as well as IAA Sections 214(a) and 215(b), *id.* §§ 80b-14(a), 80b-15(b).

19.     Section 36(b) of the ICA "grant[s] individual investors a private right of action for breach of fiduciary duty" related to any payment of a material nature received by any investment adviser or director of a registered investment company. *Jones v. Harris Assoc. L.P.*, 559 U.S. 335, 340 (2010) (citing 15 U.S.C. § 80a-35(b)). Federal courts have exclusive jurisdiction over any such claim. 15 U.S.C. § 80a-35(b)(5).

20.     ICA Section 47(b) confers "an implied private right of action for rescission" of contracts that violate the ICA. *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 102 (2d Cir. 2019). The ICA provides the "district courts of the United States" with jurisdiction over such suits. 15 U.S.C. § 80a-43.

21.     IAA Section 215 "provides that contracts whose formation or performance would violate the [IAA] 'shall be void . . . as regards the rights of' the violator'" and confers a private right of "suit for rescission or for an injunction against continued operation of the contract, and for restitution." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 16, 19 (1979) (quoting 15 U.S.C. § 80b-15). The IAA provides that "the district courts of the United States . . . shall have jurisdiction" over such suits. 15 U.S.C. § 80b-14(a).

22.     This Court has personal jurisdiction over each of the Defendants because each of the Defendants transacts business within the state of New York. Among other things, the Company's securities are listed for trading on the Nasdaq stock market in New York and Defendants have sent numerous communications regarding the Company to and from New York.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2).

### III. THE PARTIES

24.     Plaintiff George Assad has held shares of E.Merge at all times relevant hereto, continues to hold E.Merge shares, and will continue to hold shares through this litigation.

25.     Nominal defendant E.Merge is a Delaware corporation organized on May 22, 2020.

26.     Sponsor is a Delaware limited liability company. Its managing members are Jeff Clarke, Alex Vieux, and Steven Fletcher.

27.     S. Steven Singh is the Chairman of the Company's Board of Directors and a member of the Sponsor.

28.     Jeff Clarke is Co-Chief Executive Officer, Chief Financial Officer, and Secretary of the Company. He is also a member of the Board of Directors of E.Merge, and a managing member of the Sponsor.

29.     Guy Gecht is Co-Chief Executive Officer of the Company and a member of the Sponsor.

30.     Shuo Zhang is a member of the Board of Directors and a member of the Sponsor.

31.     David ibnAle is a member of the Board of Directors and a member of the Sponsor.

32.     Curtis Feeny is a member of the Board of Directors and a member of the Sponsor.

33.     Alex Vieux is an advisor to the Company and a managing member of the Sponsor.

34.     Steven Fletcher is an advisor to the Company and a managing member of the Sponsor.

35.     Defendants Clarke, Feeny, ibnAle, Singh, and Zhang are referred to herein as the "Director Defendants."

36.     Defendants Vieux and Fletcher are referred to herein as the "Advisor Defendants."

## IV. FACTUAL ALLEGATIONS

### A.     Origins of the Company

37.     The Company began its life when it was incorporated in Delaware on May 22, 2020. At the time of its formation, it had no assets and no plans for operating a company. Its primary business was to invest in securities.

38.     On July 29, 2020, the Company filed an amended preliminary registration statement with the SEC in preparation for raising capital through an offering of securities to the public. In the prospectus attached to this registration statement (the "Prospectus"), the Company described itself as a "blank check company." It planned to invest all of its IPO proceeds in securities and eventually complete what the Company's foundational documents defined to be an "Initial Business Combination."[3]

39.     Under the terms of the Company's Second Amended and Restated Certificate of Incorporation (the "Certificate of Incorporation," or "COI"), the Initial Business Combination has to be completed within "24 months from the closing of the [IPO]."[4] The Initial Business Combination may be completed through a "merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination, involving the Corporation and one or more businesses."[5]

40.     In the IPO, the Company offered a combination of securities in what the Company called "Units" (each, an "IPO Unit"). Each Unit sold for $10 and consisted of one share of Class A Common Stock and 1/3 of a warrant (a "Common Warrant"). Each Common Warrant provided its holder with the right to purchase a share of Class A common stock at $11.50 per share during the period commencing 30 days after the Initial Business Combination and expiring five years after the Initial Business Combination.[6]

---

[3] E.Merge, Amendment No. 3 to Form S-1 (Form S-1/A), at 2 (July 30, 2020) (hereinafter, the "Prospectus").

[4] Second Amended and Restated Certificate of Incorporation of E.Merge Technology Acquistion Corp., § 9.1 (July 30, 2020) (hereinafter, the "Certificate of Incorporation").

[5] *Id*., Art. II.

[6] Prospectus, at 122.

41.     The Company's Class A common stock carries a right to redemption. Prior to completing the Initial Business Combination, each holder of a Class A share will be given the option to redeem at a price per share equal to the aggregate amount then on deposit in the trust account divided by the number of shares outstanding.[7] Although the warrants and shares of common stock were sold together as a unit, investors were later given the option to trade them separately on the Nasdaq stock exchange.

42.     After hiring underwriters to market the IPO Units, the Company consummated its IPO on August 4, 2020. The Company sold 52.2 million IPO Units at a price of $10 each, for total proceeds of $522 million.

43.     On September 4, 2020, the Company sold an additional 7.8 million Units pursuant to its underwriters' exercise of their over-allotment option, thereby bringing the Company's total gross IPO Proceeds to $600 million.[8]

44.     At the same time it completed its IPO, the Company sold 1.2 million private placement units ("Private Placement Units") to the Sponsor in a private placement at a price of $10 per Private Placement Unit, raising $12 million.[9]

**B.     The Company Invests All of Its IPO Proceeds in Securities**

45.     After the IPO, the Company invested the proceeds it raised in securities. The Company explained that "[f]ollowing the consummation of our Initial Public Offering, the net proceeds received . . . have been invested in U.S. government treasury bills, notes or bonds with a

---

[7] *Id*., at 90.

[8] E.Merge Technology Acquisition Corp. Annual Report, at 25 (July 2, 2021) (hereinafter, the "2021 10K/A").

[9] E. Merge, Current Report (Form 8-K), at 1 (Aug. 5, 2020).

maturity of 185 days or less or in certain money market funds that invest solely in U.S. treasuries."[10]

46.     The $600 million raised by the Company through its IPO was invested in securities. Of the $600,948,466 in assets the Company owned as of June 30, 2021, $600,075,327 was invested in government securities and shares of common stock in money market funds.[11]  These securities are the only source from which the Company receives any income or revenues.[12]

47.     The Company has no operations and will have no operations or operating revenue until after its Initial Business Combination.

**C.     The Defendants Completely Control the Company**

48.     Like other investment companies, E.Merge is dominated from the outside by its sponsor and its sponsor's affiliates.

49.     E.Merge does not have any full-time employees of its own.[13] Instead, all of its officers, directors, and advisors are supplied externally by the Sponsor.

50.     The Individual Defendants are all members of the Sponsor. They do not take any compensation from the Company directly, instead taking their compensation indirectly by virtue of their ownership interest in the Sponsor. The Company compensates the Individual Defendants by first paying the Sponsor and then letting the Sponsor divide the payments among the Individual Defendants via their membership interests in the Sponsor.

---

[10] 2021 10-K/A, at 27.

[11] E. Merge, Quarterly Report (Form 10-Q) at 1, 16 (Aug. 13, 2021) (hereinafter, the "Quarter 2 10-Q").

[12] *Id*., at 4, 16.

[13] Prospectus, at 46.

51.    Because the Individual Defendants are all members of the Sponsor and receive their compensation from the Company through the Sponsor, they all share a common set of economic interests and they are all loyal to the Sponsor.



FIGURE 1: ORGANIZATION OF E.MERGE AND AFFILIATED ENTITIES

52.     The Defendants have coordinated to dominate the governance of the Company. Defendant Clarke was the Company's director at the Company's inception and he later nominated the other Director Defendants to their positions on the Company's Board of Directors.

53.     Acting alone or with others, Defendant Clarke drafted the Certificate of Incorporation to divide the Directors into three classes, with only one class eligible for election by shareholders each year.[14] This division of the Board of Directors into classes ensures that to take control of the Company, the public holders of the Class A common stock would have to win elections for directors two successive years in a row.

54.     The Company's Certificate of Incorporation requires the Company, however, to complete an Initial Business Combination within two years from the date of the IPO. The requirement of two years of victories in elections for the Board of Directors therefore has the practical effect of making it impossible for the public holders of the Company's Class A common stock to gain control of the Board of Directors prior to the Initial Business Combination.

55.     The relationship between the Company and the Sponsor thus resembles the standard pattern that characterizes relationships between investment companies and their advisers and sponsors more generally. In this pattern, a business that specializes in giving investment advice (the investment "adviser" or "sponsor") separately incorporates or organizes another business (the investment "company" or "fund") for the purpose of investing in securities. The sponsor then recruits other investors to invest in the company and profits from the company by charging it a fee or otherwise taking payments from the company for the sponsor's services.

56.     At the time the sponsor establishes the investment company, the sponsor puts in place governance arrangements that allow it to dominate the company and control its affairs. The

---

[14] *Id*., at 106; Certificate of Incorporation, § 5.2(b).

investment company has no employees or other operational resources of its own, relying instead on the sponsor to supply all of the professionals, office space, and other operational re-sources the company requires to operate. The sponsor may repeat this relationship with other investment companies.

57.     This pattern appears across the investment fund advisory industry and in almost every type of business the ICA is designed to regulate, including registered investment companies such as mutual funds, closed-end funds, and ETFs, as well as private funds that would be required to register as investment companies under the ICA if they sold securities to the public, such as private equity funds, hedge funds, and venture capital funds.

**D.     The Defendants' Compensation**

58.     The Sponsor and the Individual Defendants have used their control over the Company to extract an immense amount of compensation.

59.     On June 8, 2020, the Individual Defendants or a subgroup thereof used their control over the Company to cause the Company to issue 10,062,500 shares of Class B common stock to the Sponsor for a purchase price of $25,000.[15]

60.     In July 2020, the Individual Defendants caused the Company to effect a 0.428571 for 1 stock dividend and a 0.044 for 1 stock dividend for each share of Class B common stock outstanding, such that the Sponsor now holds 15,007,500 shares of Class B common stock.[16]

61.     The Class B shares belonging to the Sponsor now represent 20% of the total voting power and outstanding equity of both classes of common stock of the Company.

---

[15] Prospectus, at Ex. 10.5 (Securities Subscription Agreement) (June 8, 2020), § 11.

[16] Prospectus, at 13.

62.     Although the Individual Defendants purport not to have been paid any compensation for their work for the Company,[17] in fact the Individual Defendants have all been compensated indirectly through their ownership of the Sponsor. The Company's prospectus states that "[e]ach of our officers, directors and advisors is or will be, directly or indirectly, a member of our sponsor."[18] Any compensation or payments granted to the Sponsor thus ultimately accrue to the benefit of the Individual Defendants by virtue of the Individual Defendants' ownership of the Sponsor.

63.     Upon completion of the Initial Business Combination, the Class B shares will convert to shares of Class A common stock and will therefore enjoy the same economic rights as the existing shares of Class A common stock.[19] The ratio of the conversion will be at least one to one, which will guarantee that the Sponsor Defendant will receive a number of Class A shares equal to at least 25% of all the Class A shares outstanding at the time of the IPO or (equivalently) 20% of the total number of both Class A and Class B shares outstanding at the time of the IPO. The conversion ratio further ensures that if the Company issues new shares to third-party investors to finance the Initial Business Combination, the Sponsor will receive additional shares of Class A common stock equal to 25% of the number of new shares issued.[20]

---

[17] *Id.*, at 106.

[18] *Id.*, at 113.

[19] Certificate of Incorporation, § 4.3(b).

[20] For purposes of this calculation, the tally of new shares includes "all shares of Class A Common Stock issued or issuable (upon the conversion or exercise of any equity-linked securities or otherwise) by the Corporation, related to or in connection with the consummation of the Initial Business Combination (excluding any securities issued or issuable to any seller in the Initial Business Combination, any private placement warrants (or underlying securities) issued to E.Merge Technology Sponsor LLC (the "Sponsor") or its affiliates upon conversion of loans to the Corporation[)]." Certificate of Incorporation, § 4.3(b)(ii).

64.     The guarantee that the Sponsor Defendant will receive at least 25% of all the Class A shares issued at the time of the IPO creates the possibility that the Sponsor Defendant may end up holding an even larger portion of the total common stock outstanding after the Initial Business Combination. If more than 75% of the Class A common stock issued in the IPO gets redeemed in connection with the Initial Business Combination—a not infrequent occurrence among SPACs[21]— the Sponsor Defendant could end up holding more shares of Class A common stock at the time of the Initial Business Combination than all other shareholders of the Company combined.

65.     Because they represent such a large stake in the Company, the economic value of the Class B shares could exceed $100,000,000. The difference between this amount and the $25,000 the Sponsor paid for these shares represents compensation by the Company to the Defendants.

66.     By diverting 20% of the Company's value to the Defendants, the Class B shares will reduce the amount of value available for the public holders of the Class A shares. The Company acknowledged the impact of the Class B shares in its prospectus, stating, "Our sponsor paid an aggregate of $25,000, or approximately $0.002 per founder share, and, accordingly, you will experience immediate and substantial dilution from the purchase of our Class B common stock."[22]

67.     Once the Company completes an Initial Business Combination, the value of the Company's investment must increase by 20% before the public shareholders even cover the cost

---

[21] Michael Klausner, Michael Ohlrogge, & Emily Ruan, *A Sober Look at SPACs* 10 (Stan. L. & Econ. Olin Working Paper No. 559, 2021).

[22] Prospectus, at 52.

of the Class B shares—let alone the underwriting fees, the dilution from private stock offerings, and the many other costs with which the Company will be burdened.

## V. E. MERGE IS AN INVESTMENT COMPANY UNDER THE ICA

68.     The activities and organization of E.Merge all point to the legal conclusion at the heart of this action: the Company is an investment company as defined by the ICA.

69.     The ICA defines an investment company as a company that invests in securities. And investing in securities is all the Company has ever done with the great majority of its assets.

70.     The key definition of an investment company appears in section 3(a)(1)(A) of the ICA. That section provides:

> (a)(1) When used in this subchapter, "investment company" means any issuer which—
>
> (A) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities . . . .[23]

71.     Investing in securities is the Company's primary business because that is virtually all the Company has ever done with its assets. Since the time of its IPO, the Company has invested nearly all of its assets in securities of the U.S. government and securities of money market mutual funds. Of the $600,948,466 in assets the Company owned as of June 30, 2021, it invested $600,075,327 in government securities and shares of common stock in money market funds.[24] These securities are the only source from which the Company receives any income or revenues.[25]

---

[23] 15 U.S.C. § 80a–3(a)(1)(A). Prior to the passage of the National Securities Markets Improvement Act of 1996, § 3(a)(1)(C) was designated as § 3(a)(1). *See* National Securities Markets Improvement Act of 1996, Pub. L. No. 104-290, 110 Stat. 3416, 3435.

[24] Quarter 2 10-Q, at 1, 16.

[25] *Id*., at 4, 16.

72.     Government securities and shares of stock in money market mutual funds are "securities" within the meaning of ICA Section 3(a)(1)(A). Section 2(a)(36) of the ICA expressly defines the term "security" to include, among other things, any share of "stock" (which covers the Company's shares of stock in money market funds) and any "bond, debenture, [or] evidence of indebtedness" (which covers the Company's holdings of government bonds). The ICA definition of a security also includes "any interest or instrument commonly known as a 'security,'" which covers both the Company's shares in money market funds and its holdings of government bonds.[26]

73.     The courts and the SEC have said many times that both U.S. government bonds[27] and shares of common stock in money market funds[28] are unambiguously "securities," not only under the ICA generally, but also specifically within the meaning of section 3(a)(1)(A).

---

[26] 15 U.S.C. § 80a-2(a)(36).

[27] *See, e.g.*, *SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 536 (2d Cir. 1984) (holding an issuer that invested solely in government securities to be an investment company under § 3(a)(1)(A)). *See also* Letter to Baker, Watts & Co. from the U.S. Sec. & Exch. Comm'n Div. of Investment Management, Fed. Sec. L. Rep. 77,225, 1982 WL 29238, at *1 ("[A]n issuer could invest exclusively in Government securities, thereby owning no investment securities, and yet be an investment company under section 3(a)(1)[A] of the Act."); Letter to Credit Suisse First Boston Corp. from the U.S. Sec. & Exch. Comm'n Div. of Investment Management, 1998 WL 799305, at *3 (Sept. 9, 1998) ("If a trust is engaged primarily in the business of investing in securities, it is an investment company even if it holds only government securities."); Letter to Financial Funding Group, Inc. from the U.S. Sec. & Exch. Comm'n Div. of Investment Management, 1982 WL 28965, at *1 (March 3, 1982) ("The fact that these securities may also be United States Government securities is irrelevant for purposes of section 3(a)(1)[A]."); Letter to Arizona Property Investors, Ltd. from the U.S. Sec. & Exch. Comm'n Div. of Investment Management, 1979 WL 14220 (Aug. 9, 1979) (treating as an investment company under section 3(a)(1)(A) a company that planned to temporarily invest solely in government securities while waiting to acquire interests in real estate); J.D. Gillespie, Tr. for Cleo George, 13 S.E.C. 470, 475 n.4 (1943) ("The broader term 'securities' used in section 3(a)(1)[A] obviously includes Government obligations.")

[28] Letter to Willkie Farr & Gallagher from the Office of Chief Counsel, U.S. Sec. & Exch. Comm'n Div. of Investment Management, at 7 (Oct. 23, 2000).

## VI. THE ADVISOR DEFENDANTS ARE THE COMPANY'S INVESTMENT ADVISERS

74.    The Advisor Defendants are the Company's investment advisers. The term "investment adviser" is defined in both the IAA and the ICA. The Advisor Defendants qualify under both definitions.

75.    The IAA provides:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. . . .[29]

76.    The Advisor Defendants satisfy this definition because they have, for compensation, engaged in the business of advising the Company about the "value of" and "advisability of investing in" and "purchasing" securities.

77.    As explained above, the Company's Prospectus and other documents describe an arrangement in which the Company has no full-time employees of its own and instead relies entirely on the various members of the Sponsor, including the Advisor Defendants, to provide the Company's necessary investment advice.

78.    The Company's Prospectus discloses that the Advisor Defendants will "(i) assist us in sourcing and negotiating with potential business combination targets, [and] (ii) provide their business insights when we assess potential business combination targets."[30] This constitutes advice "as to the value of securities or as to the advisability of investing in, purchasing, or selling securities. . . .[31]

---

[29] 15 U.S.C. § 80b-2(a)(11).

[30] Prospectus, at 106.

[31] 15 U.S.C. § 80b-2(a)(11).

79.     The Advisor Defendants have been compensated for this investment advice by the Company. They are members of the Sponsor and they therefore benefit from the profits generated on the Class B shares issued by the Company to the Sponsor.

80.     In addition to being investment advisers under the IAA, the Advisors are also investment advisers under the ICA. The definition in the ICA provides:

> "Investment adviser" of an investment company means (A) any person (other than a bona fide officer, director, trustee, member of an advisory board, or employee of such company, as such) who pursuant to contract with such company regularly furnishes advice to such company with respect to the desirability of investing in, purchasing or selling securities or other property, or is empowered to determine what securities or other property shall be purchased or sold by such company, and (B) any other person who pursuant to contract with a person described in clause (A) of this paragraph regularly performs substantially all of the duties undertaken by such person described in said clause (A) . . . .[32]

The Advisor Defendants satisfy this definition for the same reasons that they satisfy the definition under the IAA.

81.     The contract required by this definition in the ICA is the understanding under which the Advisor Defendants agreed to supply the Company with investment advice in exchange for the Company's grant to the Sponsor Defendant of the Class B shares at a nominal price.

## VII. THE CONTRACTS BETWEEN THE COMPANY AND THE DEFENDANTS VIOLATE THE ICA

82.     The ICA contains many regulations that ensure the transparency, procedural fairness, and reasonableness of compensation an investment company pays to the outside sponsor or investment adviser that dominates it. The Company has violated these regulations in many ways, with the result that the contracts creating the compensation received by the Defendants are illegal.

---

[32] 15 U.S.C. § 80a-2(a)(20).

Specifically, the ICA has been violated by the portions of the Company's Certificate of Incorporation that create the rights of the Class B shares and the Class B share purchase agreement by which the Sponsor purchased the Class B shares at a discounted price. Together, these contracts are referred to herein as the "Illegal Contracts." The formation and performance of these Illegal Contracts violate the ICA in several ways, including but not limited to the following.

83.  **First**, the Illegal Contracts violate the ICA because they involve sales of securities without proper registration under the ICA by the Company. Section 7(a)(1) of the ICA provides that unless an investment company has duly registered with the SEC as an investment company under section 8 of the ICA, the investment company may not "offer for sale, sell, or deliver after sale, by the use of the mails or any means or instrumentality of interstate commerce, any security or any interest in a security, whether the issuer of such security is such investment company or another person."[33]  Because the Illegal Contracts involve the issuance of shares of stock that qualify as "securities" and because the Company entered the Illegal Contracts at a time when it had not registered with the SEC as an investment company under section 8 of the ICA, the Illegal Contracts violate federal law.

84.  **Second**, the Class B shares violate sections 22(a) or 23(b) of the ICA, which prohibit an investment company from issuing shares of common stock for less than their net asset value. The shares of Class B stock were issued to the Sponsor for just $0.002 per share even though shortly thereafter the IPO Units were issued to the public for $10 per Unit. Additionally, when new shares of Class A stock are issued to the Sponsor upon the conversion of the Class B stock to Class A stock at the time of the Initial Business Combination, the effective price of these newly issued Class A shares will be lower than the Company's net asset value.

---

[33] 15 U.S.C. § 80a-7(a)(1).

85.     *Third*, the Class B shares were issued to the Sponsor for illegal consideration. Sections 22(g) and 23(a) of the ICA provide that "[n]o registered [open- or closed-end investment] company shall issue any of its securities . . . for services. . . ."[34]  Because the Sponsor paid only a nominal amount for the Class B shares it received from the Company, the Class B shares were effectively issued to the Sponsor as compensation for the services to be provided to the Company by the Defendants.

86.     *Fourth*, the Illegal Contracts entered into by the Sponsor Defendant and the Advisor Defendants in consideration of the investment advisory services provided by the Advisor Defendants violate section 203(a) of the IAA. That section prohibits an investment adviser "unless registered under this section" from making "use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser."[35]

87.     The Advisor Defendants have used the instrumentalities of interstate commerce in connection with providing investment advice to the Company, but have never registered with the SEC as investment advisers.

88.     *Fifth*, the Illegal Contracts entered by the Sponsor Defendant and the Advisor Defendants in consideration of the investment advisory services the Advisor Defendants have provided violate section 205(a)(1) of the IAA. That section prohibits an investment adviser from entering into an investment advisory contract if the contract "provides for compensation to the investment adviser on the basis of a share of capital gains upon or capital appreciation of the funds or any portion of the funds of the client."[36]  The Class B shares entitle the Sponsor and

---

[34] 15 U.S.C. §§ 80a-22(g), 23(a).

[35] 15 U.S.C. § 80b-3(a).

[36] 15 U.S.C. § 80b-5.

Advisor Defendants to "a share of capital gains upon or capital appreciation of the funds" of the Company.

89.    **Sixth**, the Illegal Contracts violate the requirements in section 15 of the ICA governing the manner in which a contract between an investment company and an adviser must be made. One requirement is that such a contract must be "approved by the vote of a majority of the outstanding voting securities" of the investment company.[37]  None of the Illegal Contracts was ever approved by a vote of the Company's Class A common stockholders.

90.    Another requirement under section 15 is that an advisory contract must be "written."[38]  But the Company has disclosed in its Prospectus that the Advisors "have no written advisory agreement with us."[39] Although the Illegal Contracts are written representations of the aspects of the Advisor Defendants' investment advisory agreement governing compensation, the Illegal Contracts contain no written representations of the kinds of investment advisory services the Advisor Defendants must supply in exchange for this Compensation.

## VIII. THE PAYMENTS MADE TO THE DEFENDANTS BREACH THE DEFENDANTS' FIDUCIARY DUTIES

91.    The Director and Advisor Defendants have also breached their fiduciary duties with respect to the compensation and payments they have received from the Company. Section 36(b) of the ICA provides:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment

---

[37] 15 U.S.C. § 80a-15(a).

[38] 15 U.S.C. § 80a-15(a).

[39] Prospectus, *supra* note 3, at 106.

> adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.[40]

92.     The fiduciary duty in this section is enforceable by an express private right of action.[41] This private right of action reaches any "compensation for services, or . . . payments of a material nature" granted to an "any . . . person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments."[42]

93.     The persons enumerated in subsection (a) of section 36 include any "officer" or "director" of an investment company.

94.     Section 36(b) therefore applies to compensation paid and payments made to each of the Individual Defendants by virtue of their status as officers, directors, or advisers. The payments made to the Individual Defendants include the issuance of the Class B shares, which the Company paid to the Individual Defendants indirectly by issuing these shares to the Sponsor Defendant, of which each of the Individual Defendants are all members and owners.

95.     The Director Defendants each owe a fiduciary duty to the Company regarding compensation and payments received from the Company under Section 36(b) and by virtue of their

---

[40] 15 U.S.C. § 80a-35(b).

[41] 15 U.S.C. § 80a–35(b).

[42] 15 U.S.C. § 80a-35(b).

status as officers and directors of the Company under the common law of agency and the Delaware General Corporation Law.

96.     Section 36(b) also applies to the Advisor Defendants by virtue of their status as investment advisers of the Company.

97.     Section 36(b) also applies to the Sponsor Defendant by virtue of its status as an affiliated person of the Advisor Defendants.

98.     According to the Supreme Court and the Second Circuit, the fiduciary duty in section 36(b) prohibits any payment "that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."[43]

99.     The payments made by the Company to the Advisor and Director Defendants (through the Sponsor Defendant) bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining. Through the Sponsor, the Director and Advisor Defendants have received compensation that could end up being worth more than $100,000,000 dollars for just two years of work and a nominal payment of just $25,000.

100.     The services provided by the Director and Advisor Defendants do not justify such an extraordinary level of compensation. Since its IPO, the Company has performed poorly.  The Company has announced no material activities in more than a year. And the price of the Company's Class A common stock on the Nasdaq has underperformed the rest of the stock market, falling slightly below the IPO price even though the public shareholders know they may eventually

---

[43] *Jones*, 559 U.S. at 346 (2010); *Gartenberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).

redeem for more than the IPO price and even though the S&P 500 index has risen since the Company's IPO by approximately 34%.[44]

## IX. HARM TO E.MERGE INVESTORS; DAMAGES

101.    Each of the Illegal Contracts has injured the Company, Plaintiff, and all other holders of Class A common stock and enriched the Defendants by granting the Defendants compensation and payments worth more than one hundred million dollars.

102.    The Advisor and Director Defendants collectively own shares that will constitute at least 20% of the total shares of common stock of the Company outstanding at the time of the Initial Business Combination and possibly far more. The Defendants' acquisition of these shares for a mere $25,000 represents a massive dilution of what the fair market value of 20% of the Company should be.

103.    The Class B shares will reduce the value of the Class A common stock held by the public. As the Company acknowledged in its prospectus, the holders of the Class A Common Stock "will experience immediate and substantial dilution" due to the issuance of the Class B shares.[45]

104.    The effect of all this dilution will be profound. Once the Company completes an Initial Business Combination, the value of the Company's investment must increase by 20% before the public shareholders even cover the cost of the Class B shares—let alone the underwriting fees, the dilution from private stock offerings, the Private Placement Units, and the many other costs with which the Company will be burdened.

---

[44] These values reflect closing prices of the S&P 500 index and the E.Merge Class A common stock on August 19, 2021.
[45] Prospectus, at 53.

## X. CLASS ALLEGATIONS

105.    In addition to asserting derivative claims on behalf of the Company, Plaintiff, a stockholder in the Company, brings this action under section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), and section 215(b) of the IAA, 15 U.S.C. § 80b-15(b), individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all record and beneficial holders of E.Merge Class A common stock, who hold such shares at the time of the filing of this action (except the Defendants herein, and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants) to redress the Defendants' breaches of fiduciary duties and other violations of law.

106.    This action is properly maintainable as a class action.

107.    A class action is superior to other available methods of fair and efficient adjudication of this controversy.

108.    The class is so numerous that joinder of all members is impracticable.  The number of class members is believed to be in the thousands, and they are likely scattered across the United States.  Moreover, damages suffered by individual class members may be small, making it overly expensive and burdensome for individual class members to pursue redress on their own.

109.    There are questions of law and fact which are common to all class members and which predominate over any questions affecting only individuals, including, without limitation:

      (a)    whether E.Merge is an investment company within the meaning of the ICA;

      (b)    whether the Advisor Defendants are investment advisers within the meaning of the ICA and the IAA;

      (c)    the proper remedy for E.Merge's violations of the ICA and IAA;

      (d)    whether the Illegal Contracts have violated the ICA and IAA; and

(e)     the existence and extent of any injury to the class or Plaintiff caused by any violations.

110.    Plaintiff's claims and defenses are typical of the claims and defenses of other class members and Plaintiff has no interests antagonistic or adverse to the interests of other class members. Plaintiff will fairly and adequately protect the interests of the class.

111.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

112.    Defendants have acted in a manner that affects Plaintiff and all members of the class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the class as a whole.

113.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

## XI. DEMAND FUTILITY ALLEGATIONS

114.    Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Defendants' wrongdoing alleged herein, and has been a shareholder of the Company at all times relevant herein.

115.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

116.    Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because such demand is excused.

117.    Under section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), Plaintiff is entitled to bring this Action on behalf of the Company in the Plaintiff's right as a securityholder of the Company to redress the Defendants' breaches of their fiduciary duties with respect to the compensation and payments they have received from the Company. A claim brought under Section 36(b) of the ICA does not require a complaining stockholder to make a demand. *Daily Income Fund v. Fox*, 464 U.S. 523, 527-542 (1984).

118.    Under section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), and section 215(b) of the IAA, 15 U.S.C. § 80a-15(b), Plaintiff is entitled to bring this action derivatively in the right and for the benefit of the Company to rescind the Illegal Contracts for having been made and performed in violation of the ICA and IAA.

119.    Demand upon the Board would be a futile and useless act with respect to ICA section 47(b) and IAA section 215(b) and is therefore excused because each of the members of the Company's Board is personally conflicted with respect to the institution of this suit.

120.    Demand would be a futile and useless act with regard to the Director Defendants because of their interest in the Class B shares via their membership interests in the Sponsor Defendant. If this action is successful, the Class B shares will become worthless and the Director Defendants will lose compensation and payments potentially worth more than a hundred million dollars.

## COUNT I
## DECLARATORY JUDGMENT

121.    Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

122.    As a result of the facts described above, an actual, present, and justiciable controversy exists between Plaintiff and Defendants.

123.     Accordingly, Plaintiff seeks a declaration that the Company is an investment company within the meaning of the ICA.

124.     Plaintiff also seeks a declaration that the Advisor Defendants are investment advisers within the meaning of the IAA and ICA.

## COUNT II
## VIOLATION OF 15 U.S.C. § 80a-35(b)

125.     Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

126.     Plaintiff asserts this claim on behalf of the Company in the Plaintiff's right as a securityholder of the Company.

127.     Under section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the Individual Defendants' interests in the Class B shares via their ownership of the Sponsor constitute a breach of fiduciary duty with respect to the receipt of compensation for services or of payments of a material nature paid by the Company or its securityholders to the Defendants.

128.     The Director Defendants are liable for violations of ICA § 36(b) because they are directors and/or officers of the Company.

129.     The Advisor Defendants are liable for violations of ICA § 36(b) because they are investment advisers of the Company.

130.     The compensation represented by the Class B shares is so disproportionately large that it bears no reasonable relationship to any services rendered by the Defendants and could not have been the product of arms'-length bargaining.

131.     The Compensation paid to the Defendants comes at the direct expense of Plaintiff and the Company's other Class A public shareholders.

132.     The Class B shares paid to the Defendants accordingly constitute a breach of the Defendants' fiduciary duty.

## COUNT III
## VIOLATION OF 15 U.S.C. § 80a-46(b)

133.     Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

134.     Plaintiff asserts this claim derivatively, on behalf of the Company.

135.     Plaintiff also asserts this claim directly, in his capacity as a holder of the Company's Class A common stock, on behalf of himself and all record and beneficial holders of E.Merge Class A common stock, who hold such shares at the time of the filing of this action (except the Defendants herein, and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants).

136.     Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), provides:

(1) A contract that is made, or whose performance involves, a violation of this subchapter, or of any rule, regulation, or order thereunder, is unenforceable by either party (or by a nonparty to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this subchapter or of any rule, regulation, or order thereunder) unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this subchapter.

(2) To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter.

(3) This subsection shall not apply (A) to the lawful portion of a contract to the extent that it may be severed from the unlawful portion of the contract, or (B) to preclude recovery against any person for unjust enrichment.

137.    The Company is an "investment company" within the meaning of section 3(a)(1)(A) of the ICA.

138.    The Illegal Contracts are contracts whose making and performance involve violations of the ICA, including, but not limited to sections 7(a)(1), 15, 22(a) or 23(b), and 22(g) or 23(a) of the ICA.

139.    The Plaintiff is a party to the Certificate of Incorporation by virtue of his status as a holder of the Company's Class A common stock.

140.    The Company is a party to the Illegal Contracts by virtue of being governed by the Certificate of Incorporation and having entered the agreement with the Sponsor by which the Sponsor purchased the Class B shares.

### COUNT IV
### VIOLATION OF 15 U.S.C. § 80b-15(b)

141.    Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

142.    Plaintiff asserts this claim derivatively, on behalf of the Company.

143.    Plaintiff also asserts this claim directly, in his capacity as a holder of the Company's Class A common stock, on behalf of himself and all record and beneficial holders of E.Merge Class A common stock, who hold such shares at the time of the filing of this action (except the Defendants herein, and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants).

144.    Section 215(b) of the IAA, 15 U.S.C. § 80b-15(b), provides:

> Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision,

rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

145.   The Advisor Defendants are investment advisers within the meaning of section 2(a)(11) of the IAA.

146.   The Advisor Defendants have provided advice to the Company regarding the advisability of investing in or purchasing securities.

147.   The Illegal Contracts are contracts whose making and performance involve violations of the IAA, including but not limited to sections 203(a) and 205(a)(1) of the IAA.

148.   The Plaintiff is a party to the Certificate of Incorporation by virtue of his status as a holder of the Company's Class A common stock.

149.   The Company is a party to the Illegal Contracts by virtue of being governed by the Certificate of Incorporation and having entered the agreement with the Sponsor by which the Sponsor purchased the Class B shares.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for a judgment as follows:

A.  Declaring that E.Merge is an investment company within the meaning of the ICA;

B.  Declaring that the Advisor Defendants are investment advisers within the meaning of the IAA;

C.  Rescinding the Illegal Contracts;

D.  Enjoining the Sponsor from converting any Class B shares into Class A shares;

E.  Ordering the return of all Class B shares to the Company;

F.  Declaring the Class B shares void and unenforceable;

G.  Awarding the Company damages for all compensation paid or payments of a material nature made by the Company to the Defendants in breach of the fiduciary duties they owe to the Company;

H.  Awarding the Company, the Plaintiff, and the plaintiff class pre-judgment and post-judgment interest, as well as reasonable attorneys' and expert witness' fees and other costs; and

I.  Awarding Plaintiff such other relief as this Court deems just and proper.

Dated: New York, New York
       August 20, 2021

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**

*/s/ Mark Lebovitch*
Mark Lebovitch
Daniel E. Meyer
Joseph W. Caputo (Bar Admission Pending)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1519
Facsimile: (212) 554-1444
E-mail: MarkL@blbglaw.com

Gregory V. Varallo
500 Delaware Avenue
Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
E-mail: Greg.Varallo@blbglaw.com

**SUSMAN GODFREY L.L.P.**
Shawn J. Rabin
Stephen Shackelford
Cory Buland
Beatrice Franklin
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
E-mail: SRabin@susmangodfrey.com

**BUZIN LAW, P.C.**
Robert J. Jackson, Jr. (*pro hac vice forthcoming*)
John Morley (*pro hac vice forthcoming*)
111 Broadway, Suite 1204
New York, NY 10006
Telephone: (914) 819-7527
E-mail: john.morley@yale.edu

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 258-1585
Facsimile: (484) 631-1305
E-mail: rm@rmclasslaw.com